[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for custody of a minor child born out of wedlock to the defendant Kathleen Donahue. The plaintiff is the child's father. The plaintiff is 35 years old and resides at 33 Ezra Street in North Haven, Connecticut. He is employed as a postal inspector with a 48 hour week. He also has to work out of the state on some occasions and to be out late on other occasions as a result of his job.
The defendant is also an employee of the postal department in West Hartford, the same office in which the plaintiff works. She is 41 years old and lives in West Hartford. Both parties have comfortable homes. In each house the child has his own bedroom.
The parties lived together since a few months after the birth of the minor child, Thomas Lambert, Jr., in the home of the father in North Haven, Connecticut. The pregnancy occurred shortly after the parties began dating. They initially planned on getting married and providing a home for the child.
After the baby's birth, the defendant returned to her home with the child and had the help of her mother in caring for the child. The plaintiff visited her a couple of times at night and perhaps weekends but appeared to be busy with remodeling his house with the intention of having the defendant move in with him. Over a period of weeks, the plaintiff would visit the defendant once or twice a week and the defendant began to visit the plaintiff at his home in North Haven on weekends. Eventually, on the basis of the plaintiff's promising to marry the defendant, she moved into the plaintiff's home with the child in North Haven. At that time she had made arrangements for a woman in West Hartford to care for CT Page 9770 the child while she was at work. This was convenient since her office was in West Hartford and she could leave the child there on her way to work and pick him up on her way home. However, the plaintiff insisted that his mother care for the child. The plaintiff's parents lived in North Haven, a short distance from the plaintiff's home. The defendant acquiesced in this decision of the plaintiff.
Initially, the plaintiff was to bring the child to his parents' home in the morning and the defendant was to pick the child up after her work schedule at night. However, that arrangement was changed in order to suit the convenience of the plaintiff so that he began to pick up the child from his parents' home at night. Under that arrangement, however, the plaintiff began spending more and more time at his mother's, arriving at home with the child later each night. Eventually, he began eating his dinner over there and, on occasion, the defendant also joined him. When she complained about his eating at his parents, he said he liked his parents' cooking better than hers.
This situation became more upsetting to the defendant when, on one occasion, after the plaintiff had been away, she went to his parents to pick up the child only to find the plaintiff there eating his dinner with no place set for her. She was also upset when she heard the plaintiff's mother, one of the intervening grandparents in this case, state that she was going to toilet train the child within a certain time frame although she had neither discussed this with the defendant nor asked her for her consent.
In sum, the defendant felt that she was being excluded from the plaintiff's family and her wishes were being totally disregarded by the plaintiff, who continued to refuse to marry her.
The defendant then went for counseling and the plaintiff accompanied her on two occasions. The defendant thought they were at least communicating, but the plaintiff refused to go any more and the defendant then went once more. However, following that, she consulted a lawyer, and as a result of the lawyer's advice, she left the plaintiff's home with the child in June of 1992.
When the defendant decided to move, she did so without notifying the plaintiff, principally because he had always told her that she could go but the baby would stay. To prevent that from happening, she made arrangements with a friend of hers to take care of the child while she moved out of the house. Thereafter, there CT Page 9771 was a five week period in which the plaintiff was unable to see the child although there is some question whether there was an attempt to negotiate visits between the parties' attorneys.
While the defendant, at the time, attempted to give the plaintiff the legal papers which her lawyer had drafted for filing in court, he avoided legal service and instead brought his own action. Following that, the court ordered split custody with the child alternating his residence on a weekly basis between the two homes. In addition, each party was permitted to visit on Wednesday evenings at the other's home, that is, where the child was residing at the time.
The only difficulty with that visiting occurred when the defendant was staying at her parents' home and her father, for reasons which are not clear, interfered with the visiting by the plaintiff. Since that time, the defendant has been living in her house and there is no reason to expect that her father will be there when the plaintiff visits, and it would undoubtedly be better if he were not.
The Family Relations Officer, in her April report, recommended sole custody to the mother with weekend visitations of three weekends a month to the father together with a Wednesday night visit in the week in which he was not visiting during the weekend. At that time, both parties were seeking sole custody, each one for himself or herself.
Now, however, both parties are seeking joint custody. In fact, the plaintiff's requests are for joint custody and the same arrangement with respect to physical custody as presently exists; that is, the child alternating his residence on a weekly basis between the two homes. Counsel for the child has also recommended that the present situation continue on the theory that if it's not broke, don't fix it.
The trouble with that theory is that it can only be a temporary situation, as counsel for the child pointed out, since when the child goes to school, he has to have one residence. In the court's opinion it is better to make the change now than wait until he is going to school to have him undergo two changes at the same time.
The problem the court sees with joint custody is that, while both parties are asking for it, both also say that they do CT Page 9772 not communicate with each other except on a hostile basis. Unless both parties are willing to undergo parent counseling, parent training, parent effectiveness training or something of that sort, this situation may continue. It should be apparent to both parents that children are quick to sense adults' reactions and to use them to gain their own ends. The result of the parents' continuing hostile behavior to each other is to provide a training ground for the child in manipulation.
While both parties, as indicated above, have changed their requests for custody from sole to joint, each of them has in the calculations for the support order indicated a desire for sole, physical custody in their characterization of who is the custodial parent. While this may merely be the result of the way in which the calculations are set forth, nevertheless it does indicate that even with joint legal custody, there may be separate physical custody. See 46b-56a(a) of the Connecticut General Statutes.
In the court's opinion, this would be in the best interest of the child because it would provide stability for the child which would continue through the time that he entered school. Given the choice between physical custody with the father and that with the mother, it appears to the court that given the father's work schedule, which requires him to be out of state on occasion and out late on other occasions on surveillances, and given his health, which has required hospitalization on at least two occasions in the past while this case was pending, the more stable physical custody would be with the mother. In addition, there is the fact that it would be the plaintiff's parents who would be the primary caretakers of the child were he to have physical custody.
While no one questions the quality of care which the paternal grandparents have given the child, there has been a problem in the mother's feeling that she was being supplanted by the paternal grandparents and that her wishes were not even being consulted, for example, in the matter of toilet training or in the matter of where the child had his evening meal.
Moreover, the child care arrangements which the mother has are near her place of employment and her hours are such that she is able to pick the child up between 4:30 and 5:00 in the afternoon. There may also be an advantage in the kind of child care that the day care facility to which the child goes provides. He does have the opportunity to socialize with other children and to learn various skills which are provided in the day care program. CT Page 9773 While his grandparents may give him love and affection and from time to time provide him with playmates, the chance for interaction with other children is at best limited.
In sum, it seems to the court that the best interest of this child lies in his mother having sole physical custody and in both parents having joint legal custody.
The question of visitation presents another problem. The Family Relations Officer did recommend three consecutive weekends of each month to be spent with the father. While the defendant agreed to this, it seems to the court that this is excessive since it does give the father over 60 hours of, in effect, playtime with the child while the mother has only about 34 hours of that kind of time.
The court believes that three weekends every other month would be fairer to both parties and to the child. It also believes that there should only be two consecutive weekends at a time, and that during the week in which there is no weekend visit to come, the plaintiff may also visit on Wednesday from 5:30 p. m. to 8:00 p. m. and may take the child out of the defendant's home for that purpose.
The interests of the paternal grandparents have been linked to those of the plaintiff even to the extent of the filing of one brief for both parties. While the court orders will change the role of the paternal grandparents, they will have ample opportunity to enjoy the child when he is in the father's care.
This case is unique in one respect, that is, that both parties have suggested almost identical figures for the support order. The plaintiff's calculations indicate that he would owe $185.79 a week and the defendant's calculations indicate that he would owe $182.25.
The court's calculations are a little different. According to the affidavits, it appears to the court that the plaintiff's income is $1,312.91 a week and his deductibles, omitting the savings bonds which are not deductible, amount to $471.66 leaving a balance of $841.25. The defendant's income is given at $870.00 and her deductibles appear to be $495.00 leaving a balance of $375.00 for a total net income of $1216.25 for both. The support guidelines indicate that the percentage for a child of this child's age whose parents together earn $1210.00 a week is CT Page 9774 between $279.00 and $281.00 a week or 23.10 per cent. Multiplying the $1216.00 by that figure gives a balance of $280.95. Of this, the plaintiff appears to owe 69 per cent and the defendant 31 per cent. On these figures, the plaintiff's contribution per week would be $194.33 and the defendant's contribution per week would be $87.09. These do not total exactly the $280.95 which the percentage on the guidelines would seem to indicate, but that percentage is for $1210.00 and the total here is $1216.25. These figures are a little different from those submitted by counsel, but the difference is not a great one.
On the basis of the foregoing, the court makes the following findings and orders:
1. The parties shall have joint legal custody of the child, Thomas J. Lambert, Jr.
2. The defendant Kathleen Donahue shall have sole physical custody of the child with visitation by the plaintiff as follows:
 a. Beginning December 1, 1993, three weekends a month every other month, with no more than two of them consecutive; and one night a week from 5:30 p. m. to 8:00 p. m. in the week in which there is no weekend visitation to come. On the months in which there is no three weekend visitation, there shall be two weekends, not consecutively.
 b. Neither party shall remove the child from the state without the permission of the court or the written permission of the other party. Whenever the child is out of his place of residence, the party having physical custody at that time shall notify the other party of the telephone number and address of where the child is staying.
 c. Each party shall have reasonable access to the minor child while he is with the other party including by telephone during reasonable hours of the day and evening but not more than once a day.
 d. In addition to the weekend visitation, the father and mother shall alternate the holidays as follows:
1. Thanksgiving, 1993 with the mother, 1994 with the CT Page 9775 father.
 3. Christmas vacation: The defendant shall have the child from 3:00 p. m. Christmas Eve to 12:00 p. m. Christmas Day; the plaintiff shall have the child from 12:00 p. m. Christmas Day for the following three days as part of the Christmas vacation. The defendant shall have him for the remaining four days of vacation. This schedule shall alternate with the above representing the vacation for 1993.
 4. January 1st, 1994, the child's birthday, with the plaintiff and alternated thereafter.
 5. April 22, the father's birthday, with the plaintiff.
 6. Easter Sunday, 1994 with the defendant and alternated thereafter.
7. Mother's Day with the defendant.
 8. June 6, the defendant's birthday, with the defendant.
9. Father's Day with the plaintiff.
 10. July 4th, 1994 with the plaintiff and thereafter alternated.
 11. Halloween, 1994 with whomever did not have the child in 1993 and thereafter alternated.
 12. On the holidays which fall on Monday and not mentioned above, if the plaintiff's visitation falls on the weekend immediately prior thereto, then the child shall spend the holiday with the plaintiff. Otherwise, the holiday will be spent with the defendant.
 13. The plaintiff has the responsibility of picking up the child at the defendant's residence or at the day care facility, depending on the time he is able to pick up the child, and also has the responsibility of returning the child to the CT Page 9776 defendant's home by 6:00 p. m. on Sunday evening.
 14. Vacations will be alternated. Visitation will be suspended during the time that the other parent is vacationing with the child. During vacations, access to the child by the other parent shall be encouraged by the vacationing parent and telephone numbers will be given the other parent by the vacationing parent as well as addresses of the child's location. The vacationing parent will call the nonvacationing parent at least three times per week.
 15. Each parent shall notify the other of all doctor's appointments or other scheduled activities prior to such appointments or activities, also of any sudden illnesses or injuries and emergency medical appointments immediately or as soon as possible. No medical treatment decision maybe made solely by one parent unless the emergency situation dictates otherwise.
 16. When the child is with the father or the mother on his or her birthday, the time of his visit shall be from 4:00 p. m. to 8:00 p. m. unless the birthday falls on a Saturday or a Sunday, then from 10:00 a.m. to 7:00 p. m.
 17. Neither party shall move more than 50 miles from his or her present location without written agreement of both parties or an order of the court.
 18. Any decisions regarding nonemergency health care, schooling, college or any other major decision concerning the child shall be made with the input and agreement of both parties.
 19. Upon the death of either parent, the child shall immediately be put in the custody of the other parent with rights of visitation to grandparents or relatives on both sides of the family.
3. The plaintiff shall pay $194.00 a week to the defendant as child support. CT Page 9777
4. Both parties shall keep the child covered for major medical and Blue Cross/Blue Shield or its equivalent.
5. All unreimbursed medical expenses including optical, orthodontia, psychological, dental, etc., shall be shared equally.
6. The grandparents on either side shall exercise visitation during the time the child is in the physical custody of their son or daughter.
7. Each party shall name the child as irrevocable beneficiary on any of their respective existing life insurance policies.
8. Both parties shall make every reasonable effort to refrain from doing anything which may estrange the child's relationship with either party or injure the child's opinion of either party or act in any way as to hamper the free and natural development of the child's love and respect for the other party.
9. The legal fees of Attorney Ann P. Coonley, counsel for the minor child, are hereby approved, and each party is ordered to pay one half of those fees within sixty (60) days from the date of this judgment.
10. A contingent wage execution may issue.
It is so ordered.
MARGARET C. DRISCOLL STATE TRIAL REFEREE